HOLLY BLINKOFF ET AL. *v.* O AND G
INDUSTRIES, INC.
(AC 28506)

McLachlan, Lavine and Beach, Js.

1

Argued September 23, 2008—officially released March 3, 2009

*Holly Blinkoff,* pro se, the appellant (named plaintiff).

*Everett E. Newton,* for the appellee (defendant).

*Opinion*

BEACH, J. The plaintiff Holly Blinkoff[1] appeals from the judgment of the trial court, rendered in favor of the defendant, O & G Industries, Inc. (O & G), on a motion for summary judgment. The plaintiff's one count complaint alleged a violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., and contained eight allegations.[2] The plaintiff claims that the court improperly rendered summary

[1] A corporation apparently controlled by Blinkoff, Quality Sand and Gravel, Inc., was a plaintiff in the trial court. Because only Blinkoff has appealed, we refer to her as the plaintiff.

[2] The parties and the trial court analyzed independently each of the allegations of CUTPA violations. We will take the same approach.

judgment as to all of the allegations.[3] We disagree and affirm the judgment of the trial court.

At relevant times, the plaintiff owned and operated a sand and gravel quarry, and O & G owned and operated a competing quarry, both of which were located in Torrington. At times, permits from the Torrington planning and zoning commission (commission) were necessary for the operation of both businesses. In the present action, the plaintiff alleged that O & G unfairly influenced the commission to the benefit of O & G and to the detriment of the plaintiff through various alleged improper dealings and relationships between O & G and the commission. This case is the latest in a series spanning one decade of litigation. To appreciate the present case and the claims made by the plaintiff, the following litigation history is useful.

On January 20, 1995, the plaintiff filed a complaint with the commission on human rights and opportunities (CHRO). She alleged discrimination on the basis of gender and religion as to the commission and the Torrington city planner. See *Blinkoff* v. *Torrington*, CHRO No. 9530406 (May 10, 2004). O & G was not a party to that action. On January 6, 1997, the CHRO found probable cause to proceed on the allegations in the plaintiff's claim. Id. On its motion, however, the CHRO stayed the case, pending resolution of a similar complaint filed by the plaintiff in federal District Court.

In 2004, after the federal claims[4] were resolved in favor of the commission, the commission filed a motion

---

[3] Because we conclude that the court properly rendered summary judgment on the basis of the statute of limitations as to seven of the eight allegations and on the eighth allegation on the ground that it lacked competent evidence, we need not reach the plaintiff's other claims in this appeal.

[4] The United States District Court for the District of Connecticut dismissed without prejudice the two counts of the plaintiff's action that alleged discrimination in violation of state law. *Blinkoff* v. *Planning & Zoning Commission*, United States District Court, Docket No. 3:97 CV 1345 (D. Conn. January 9, 2002). No release had been obtained pursuant to General Statutes § 46a-101.

to dismiss the CHRO claim on the bases of res judicata and claim preclusion. The presiding referee, finding that the underlying facts of the federal action and the CHRO complaint were the same, dismissed the CHRO claim under the doctrine of res judicata. The CHRO appealed from the referee's decision to the Superior Court, which dismissed the CHRO's appeal on the ground of res judicata. See *Blinkoff* v. *Commission on Human Rights & Opportunities*, Superior Court, judicial district of New Britain, Docket No. CV-04-0528122-S (June 10, 2005). The CHRO then appealed to this court, which reversed the dismissal and remanded the case for further proceedings because the plaintiff's state law claims in the federal court action had been dismissed without prejudice. *Commission on Human Rights & Opportunities* v. *Torrington*, 96 Conn. App. 313, 319, 901 A.2d 46 (2006). This claim is apparently still pending before the CHRO.

Meanwhile, on July 9, 1997, while the CHRO claim was pending, the plaintiff filed an action in United States District Court for the District of Connecticut against the commission, members of the commission in their executive and individual capacities and the city planner. The plaintiff alleged discrimination due to her religious affiliation and gender, equal protection and due process violations under the fourteenth amendment, tortious interference with a business expectancy, intentional and negligent infliction of emotional distress and retaliation by selective treatment and denial of equal protection under the fourteenth amendment.[5] O & G was not a defendant in the federal action. The District Court rendered summary judgment in favor of the defendants

---

[5] Several of the allegations that the plaintiff made in the federal action are functionally identical to or derivative of those made in the present case. In particular, the allegations contained in subparagraphs 6A, 6B, 6C, 6D, 6F and 6G of the complaint in this CUTPA action are the same as the allegations made by the plaintiff in her federal complaint.

in that action as to most of the due process, tortious interference with a business expectancy and negligent infliction of emotional distress counts. The District Court did not, however, render summary judgment as to a limited claim under those counts to the extent that the plaintiff's claims related to a 1997 special exception permit application. The District Court also rendered summary judgment on all of the claims alleging intentional infliction of emotional distress and retaliation. The remaining counts were decided by the jury in favor of the defendants on April 16, 2002, and the District Court rendered judgment in accordance with that verdict. The plaintiff's appeal to the United States Court of Appeals for the Second Circuit was dismissed on June 18, 2003. See *Commission on Human Rights & Opportunities* v. *Torrington*, supra, 96 Conn. App. 317.

While the plaintiff's federal action was pending, Quality Sand and Gravel, Inc., a corporation owned by the plaintiff, appealed in state court from the decision by the commission denying its application for a special exception permit necessary for it to continue to operate its quarry. The court sustained its appeal. *Quality Sand & Gravel, Inc.* v. *Planning & Zoning Commission*, Superior Court, judicial district of Litchfield, Docket No. CV-97-0074499-S (June 1, 1998). This court affirmed the Superior Court's judgment. *Quality Sand & Gravel, Inc.* v. *Planning & Zoning Commission*, 55 Conn. App. 533, 738 A.2d 1157 (1999).

While the plaintiff was awaiting the resolution of her appeal from the commission's denial of her special exception permit, she appealed from the commission's decision to grant an application for a special exception permit filed by O & G. See *Blinkoff* v. *Planning & Zoning Commission*, Superior Court, judicial district of Litchfield, Docket No. CV-98-0078081-S (June 23, 1999). The defendants in that action were the commission and O & G. The plaintiff made several allegations in her

complaint that the commission's decision was illegal, arbitrary and an abuse of its discretion. In her brief, the plaintiff raised additional claims of impropriety on the part of the commission. Among those, the plaintiff claimed that a member of the commission, Raymond Turri, had a financial and personal conflict of interest when he acted on O & G's application because he had worked as a subcontractor for O & G on at least three prior occasions.[6] Although the court noted that it did not consider issues that were raised for the first time in the brief and not alleged in the complaint, the court did address the allegations concerning Turri and concluded that the plaintiff "failed to show that Turri had any actual or perceived conflict of interest, either personal or financial, in O & G's application, and her appeal on that issue should be rejected." Id. Addressing the merits of her appeal from the commission's decision, the court dismissed each of the plaintiff's claims and, accordingly, dismissed her appeal.

The CUTPA action that is the subject of this appeal was brought via a one count complaint served on February 22, 2001, alleging that "[O & G] obtained and exercised unfair advantage in competition" with the plaintiff and Quality and "engaged in unfair and deceptive acts and practices in trade and commerce" and thus violated provisions of CUTPA. Specifically, the plaintiff made eight allegations of misconduct in paragraph six of her amended complaint, alleging that O & G placed public officials on its payroll for the reason that they were public officials or were related to public officials (6A); made political contributions to public officials with the understanding that local rules and regulations would be applied favorably to O & G in comparison with the plaintiff (6B); caused the plaintiff's permits to be denied

_____

[6] The plaintiff makes the same claim regarding an alleged improper relationship between Turri and the commission in the CUTPA action in the present case.

when O & G's permits under the same circumstances were granted (6C); caused business regulations to be applied and enforced in a discriminatory manner against the plaintiff (6D); made arrangements to tie the sale of certain products to others (6E); caused bid specifications to be written in such a way that only O & G could meet them (6F); enforced noncompetition requirements against potential competitors (6G); and caused bidding requirements to be waived when waiver benefited O & G (6H). O & G moved for summary judgment as to all of the plaintiff's eight allegations and submitted documentation in support of the motion. The court rendered summary judgment as to each of the allegations on the following bases: collateral estoppel on allegations 6A, 6B, 6C, 6D, 6F and 6H; statute of limitations on allegations 6A, 6B, 6C, 6D, 6E, 6F and 6H; *Noerr-Pennington* doctrine[7] on allegations 6C, 6D and 6F; and lack of competent evidence on allegation 6G. This appeal followed. Additional facts will be set forth as necessary.

We review this matter under our well settled standard of review. A court shall render summary judgment "if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material

[7] The *Noerr-Pennington* doctrine, which originates from a "trio of federal antitrust cases, *California Motor Transport Co.* v. *Trucking Unlimited,* 404 U.S. 508, 92 S. Ct. 609, 30 L. Ed. 2d 642 (1972), *United Mine Workers* v. *Pennington,* 381 U.S. 657, 85 S. Ct. 1585, 14 L. Ed. 2d 626 (1965), *Eastern Railroad Presidents Conference* v. *Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S. Ct. 523, 5 L. Ed. 2d 464 (1961), and their progeny . . . shields from the Sherman [Antitrust] Act [15 U.S.C. § 1 et seq.] a concerted effort to influence public officials regardless of intent or purpose." (Internal quotation marks omitted.) *Zeller* v. *Consolini,* 59 Conn. App. 545, 550, 758 A.2d 376 (2000). "The *Noerr-Pennington* doctrine has evolved from its antitrust origins to apply to a myriad of situations in which it shields individuals from liability for petitioning a governmental entity for redress." Id., 551. The doctrine is applicable to "claims which [seek] to assign liability on the basis of the defendant's exercise of its first amendment rights." (Internal quotation marks omitted.) Id.

fact and that the moving party is entitled to judgment as a matter of law." Practice Book § 17-49. "In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The party moving for summary judgment has the burden of showing the absence of any genuine issue of material fact and that the party is, therefore, entitled to judgment as a matter of law. . . . The test is whether the party moving for summary judgment would be entitled to a directed verdict on the same facts. . . . Our review of [a] trial court's decision to grant [a] defendant's motion for summary judgment is plenary." (Internal quotation marks omitted.) *Mazurek* v. *Great American Ins. Co.*, 284 Conn. 16, 26–27, 930 A.2d 682 (2007). "A defendant's motion for summary judgment is properly granted if it raises at least one legally sufficient defense that would bar the plaintiff's claim and involves no triable issue of fact." (Internal quotation marks omitted.) *Brunswick* v. *Safeco Ins. Co.*, 48 Conn. App. 699, 704, 711 A.2d 1202, cert. denied, 247 Conn. 923, 719 A.2d 1168 (1998).

I

We first address the seven allegations that were found to be barred by the applicable statute of limitations. "Summary judgment may be granted where the claim is barred by the statute of limitations." *Doty* v. *Mucci*, 238 Conn. 800, 806, 679 A.2d 945 (1996). Summary judgment is appropriate on statute of limitation grounds when the "material facts concerning the statute of limitations [are] not in dispute . . . ." *Burns* v. *Hartford Hospital*, 192 Conn. 451, 452, 472 A.2d 1257 (1984). General Statutes § 42-110g (f), which governs CUTPA claims, provides: "An action under this section may not be brought more than three years after the occurrence of a violation of this chapter." "Where . . . a specific limitation is contained in the statute that creates the right of action and establishes the remedy, then the

remedy exists only during the prescribed period and not thereafter." *Moore* v. *McNamara*, 201 Conn. 16, 22–23, 513 A.2d 660 (1986). This statute of limitations is jurisdictional. *Avon Meadow Condominium Assn., Inc.* v. *Bank of Boston Connecticut*, 50 Conn. App. 688, 700, 719 A.2d 66, cert. denied, 247 Conn. 946, 723 A.2d 320 (1998). The plaintiff caused this CUTPA action to be served on February 22, 2001. Therefore, the alleged CUTPA violations must have occurred on or subsequent to February 22, 1998, to survive.

With the three year statute of limitations in mind, we turn to the plaintiff's allegations contained in paragraph six of the complaint. We first consider those subparagraphs that alleged improper conduct specifically by O & G. These include the hiring of public officials (6A), making political contributions in return for favorable treatment (6B), tying products to one another to eliminate the plaintiff from the competition (6E) and enforcing noncompetition requirements against potential competitors (6G).

In subparagraph 6A, the plaintiff alleged that O & G employed members of the commission because they served on the commission. This allegation concerns two commission members in particular, Turri and Rita Pacheco. We first consider Turri. The plaintiff argues that although Turri was never an employee of O & G, he was influenced by O & G because it engaged him as a subcontractor on multiple occasions. In support, the plaintiff relies on several applications and permits that tend to show a business relationship between the two. These include a building permit showing O & G as the applicant and Charlotte Hungerford Hospital of Torrington as the owner, dated November 10, 1997; an application for an electrical permit by Turri as the contractor to work on property owned by Charlotte Hungerford Hospital, dated October 14, 1998; an application for an electrical permit by Turri as the contractor

to work on property owned by Charlotte Hungerford Hospital, dated November 17, 1997; an application for an electrical permit by Turri as the contractor to work on property owned by Charlotte Hungerford Hospital, dated December 14, 1998; a building permit with O & G as the applicant and Charlotte Hungerford Hospital as the owner, dated May 1, 1997; an application for an electrical permit by Turri as the contractor to work on property owned by O & G, dated March 21, 1997; a building permit application for O & G for work to be conducted at Charlotte Hungerford Hospital, dated June 12, 1995; and a building permit application for O & G for work to be conducted at the Northwest Connecticut Association for the Arts, dated August 25, 1997. All but two of these documents predate the relevant statutory period. The two that fall within the period list Turri only, and not O & G, as the applicant for the electrical permits. With regard to Pacheco, the plaintiff refers to the fact that an employee of O & G recommended Pacheco for a position on the permanent commission on the status of women as evidence of impropriety. The recommendation letter that was submitted by the plaintiff to demonstrate this relationship is dated March 26, 1996, well before the statutory time period.

The plaintiff also claims that the city of Torrington retained the services of a consultant, Bruce Hoben, who allegedly is a cousin of Maurice Hoben, an employee of O & G. All but one of the documents submitted by the plaintiff as proof of this relationship are reports or recommendations made before the statutory period. The one document falling within the statutory period concerns O & G's quarry in Woodbury, not Torrington, and that document is not in proper evidentiary form. Furthermore, O & G submitted affidavits from Maurice Hoben and Bruce Hoben attesting to the fact that the two have never spoken about Bruce Hoben's consulting

activities on behalf of Torrington. The plaintiff provided no evidence to challenge these affidavits. See Practice Book § 17-45.

In subparagraph 6B, the plaintiff alleged that O & G made political contributions to public officials in exchange for favorable treatment. In her deposition, the plaintiff referred only to one such contribution that occurred within the statutory period, a contribution of $250 by Raymond R. Oneglia, an employee of O & G, to the campaign of the then incumbent Torrington mayor, Mary Jane Gryniuk, on October 6, 1999. This contribution, however, was made by Oneglia in his personal capacity and not on behalf of O & G. Oneglia submitted an affidavit stating that this was a personal contribution and that there was no effort to attach any influence to the contribution. In her deposition, the plaintiff also refers to a contribution made by Thomas Gelormino in 1999. The plaintiff claims that Gelormino was "extremely close friends" with Oneglia and was the president of Vets Explosives, a supplier of dynamite to O & G. The plaintiff did not provide a factual basis from which the contribution of Gelormino can be imputed to O & G. Additionally, Oneglia's affidavit states that O & G, as a corporate entity, never solicited or made political contributions. The plaintiff presents no evidence to challenge this. The plaintiff stated in a deposition that she had no knowledge of any "deal" between O & G and a Torrington official. Furthermore, O & G submitted affidavits denying that it employed any Torrington official, with one exception, after February 22, 2008.[8] On the basis of evidentiary materials submitted to the court, then, it properly found that there was no genuine issue of fact as to the statute of limitations defense to subparagraph 6B.

---

[8] O & G acknowledged that it employed one Torrington official during this period, Frank Rubino, but attested that he never served on a commission panel that took action adverse to the plaintiff and never decided an issue involving O & G.

We turn next to the plaintiff's allegation, set forth in subparagraph 6E of the amended complaint, that O & G exercised unfair advantage over the plaintiff by tying the sale of certain products only available from O & G to other products more generally available. In deposition testimony, the plaintiff claimed that she was told about supposed tying arrangements by a number of unnamed sources between 1992 and 1997. She made no allegations of any tying arrangements occurring after 1997, and the evidence she did provide was hearsay and not sufficient to create a genuine issue of fact. O & G submitted an affidavit denying the existence of any such tying arrangements. Therefore, summary judgment on statute of limitations grounds was appropriate as to this claim.

The second group of allegations concerned improper conduct by commission members, which was "caused" by O & G. In subparagraph 6C of the complaint, the plaintiff alleged that O & G caused the plaintiff's permits to be denied when, under similar circumstances, they would have been approved for O & G. The commission's denial of her application occurred on July 23, 1997, and the granting of O & G's application occurred on September 23, 1998. In addition to the fact that the denial of the plaintiff's application occurred outside of the statutory period, O & G has submitted an affidavit attesting that it has never taken a position with Torrington or the commission in opposition to any application by or on behalf of the plaintiff or Quality Sand and Gravel. The plaintiff has failed to submit any evidence to the contrary. In subparagraph 6D, the plaintiff alleged that O & G caused business regulations to be applied and enforced unequally between the plaintiff and itself. O & G has submitted an affidavit attesting that it never induced the commission or any public official to favor O & G over the plaintiff or Quality Sand and Gravel in any business dealing, permitting or enforcement action. The plaintiff has failed to present any evidence that the

tortious or prohibited conduct alleged in subparagraphs 6C and 6D occurred within the statutory period.[9]

In subparagraph 6F, the plaintiff alleged that O & G caused bid specifications to be written by public officials under its control in such a way that only O & G could meet them. In subparagraph 6H, the plaintiff alleged that O & G caused public officials to waive bidding requirements when it was likely that the plaintiff would be bidding against O & G. These allegations were premised on some level of influence or control being exercised by O & G over members of the commission or other Torrington officials. O & G has submitted affidavits denying any such conduct, and the plaintiff has failed to present any evidence to raise a genuine issue of material fact as to whether any such conduct occurred within the statutory period.

As to all of the allegations other than 6G, then, there is no genuine issue of fact as to whether O & G's conduct, if any, occurred after February 22, 1998. The plaintiff suggests, however, that the continuing course of conduct doctrine applies to toll the statute of limitations. "When the wrong sued upon consists of a continuing course of conduct, the statute does not begin to run until that course of conduct is completed. . . . [I]n order [t]o support a finding of a continuing course of conduct that may toll the statute of limitations there must be evidence of the breach of a duty that remained in existence after commission of the original wrong related thereto. That duty must not have terminated prior to commencement of the period allowed for bringing an action for such a wrong. . . . Where [our

---

[9] The commission's granting of O & G's application occurred later than February 22, 1998. This action, however, is not conduct of O & G, and submitting an application in itself is not alleged to be tortious. Whether the action of the commission can be considered a tortious act for the purpose of the continuing course of conduct doctrine will be considered in this opinion.

Supreme Court has] upheld a finding that a duty contin-
ued to exist after the cessation of the act or omission
relied upon, there has been evidence of either a special
relationship between the parties giving rise to such a
continuing duty or some later wrongful conduct of a
defendant related to the prior act. . . . The continuing
course of conduct doctrine is conspicuously fact-
bound." (Citation omitted; internal quotation marks
omitted.) *Sanborn* v. *Greenwald*, 39 Conn. App. 289,
295, 664 A.2d 803, cert. denied, 235 Conn. 925, 666 A.2d
1186 (1995).

In sum, "a precondition for the operation of the con-
tinuing course of conduct doctrine is that the defendant
must have committed an initial wrong upon the plain-
tiff." *Sherwood* v. *Danbury Hospital*, 252 Conn. 193,
204, 746 A.2d 730 (2000) (en banc). Second, "there must
be evidence of the breach of a duty that remained in
existence after commission of the original wrong
related thereto. . . . [T]hat continuing wrongful con-
duct may include acts of omission as well as affirmative
acts of misconduct . . . ." (Citations omitted; internal
quotation marks omitted.) Id., 204–205.

The plaintiff alleged that the commission's appeal
from the 1998 trial court decision that overturned the
commission's decision to deny a special exception per-
mit for the plaintiff's quarry constituted "sham litiga-
tion" that should toll the statute of limitations. At the
outset, we note again that O & G was not a party to
that action. The plaintiff seems to argue that O & G's
influence over the commission caused the commission
to pursue the appeal. The plaintiff has submitted no
evidence to support her claim that O & G had any role
in the commission's decision to appeal. O & G has
submitted an affidavit in which it attests that it never
took a position adverse to the plaintiff on any of her
permit applications. O & G was a party to only one
appeal during the statutory period. That appeal was

filed by the plaintiff to challenge the commission's decision to grant O & G a special exception permit. See *Blinkoff* v. *Planning & Zoning Commission*, supra, Superior Court, Docket No. CV-98-0078081-S. O & G prevailed on that appeal. The plaintiff herself instituted that appeal.

There was no other conduct within the statutory period that arguably could support the continuing course of conduct doctrine. A predicate to the application of the continuing course of conduct doctrine is that the defendant must owe the plaintiff a continuing duty after an initial wrongful act or omission. See *Blanchette* v. *Barrett*, 229 Conn. 256, 275, 640 A.2d 74 (1994). For there to be a genuine issue as to a continuing duty, there must be evidence of either a special relationship between the parties or some later wrongful conduct of the defendant related to the prior act. See id. There was clearly no special relationship between the parties, such as an attorney-client relationship, that would give rise to any continuing duty to act. For there to be a genuine issue as to the continuing course of conduct doctrine in this case, then, O & G must have committed some later wrongful conduct related to the prior act, and the initial act or omission was wrongful. See *Sherwood* v. *Danbury Hospital*, supra, 252 Conn. 204.

The plaintiff has failed to submit competent evidence to show that there was an initial wrongful act prior to the statutory period sufficient to trigger a course of conduct analysis and later related conduct within the period. The plaintiff's argument that the continuing course of conduct doctrine should apply is based on the commission's decision to appeal from the trial court judgment that sustained the plaintiff's appeal from the commission's denial of a special exception permit for the plaintiff. We assume that the prior related act is the initial decision by the commission, allegedly under the

influence of Turri and Pacheco, who were beholden to O & G, to deny the plaintiff's permit. The propriety of the commission's conduct, and that of its members, however, has already been litigated in federal court and has been decided in favor of the commission. A claim that those actions are tortious is therefore barred by collateral estoppel.[10]

"[C]ollateral estoppel, or issue preclusion, is that aspect of res judicata that prohibits the relitigation of an issue when that issue was actually litigated and necessarily determined in a prior action between the same parties or those in privity with them upon a different claim. . . . An issue is *actually litigated* if it is properly raised in the pleadings or otherwise, submitted for determination, and in fact determined. . . . 1 Restatement (Second), Judgments § 27, comment (d) (1982)." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Efthimiou* v. *Smith*, 268 Conn. 499, 506–507, 846 A.2d 222 (2004).

In *Efthimiou*, our Supreme Court held that when the liability of a defendant in an action is derivative of the liability of a defendant in a prior action, and the liability of the prior defendant was "properly raised in the pleadings or otherwise, submitted for determination, and in fact determined" and "that determination was essential to the judgment in the companion case, and it remains unchallenged," the plaintiff in a present action is collaterally estopped from relitigating that issue in the present action. (Internal quotation marks omitted.) Id., 507. In the present case, the plaintiff's allegations that O & G improperly influenced the commission are premised on some wrongdoing on the part of the commission.

---

[10] Additionally, there are no facts advanced to suggest that acts of the commission are attributable to O & G. In the absence of any evidence of a related act by the *defendant* within the statute of limitations, the claim is barred. See *Sherwood* v. *Danbury Hospital*, supra, 252 Conn. 203–204, and cases cited therein.

This issue was litigated and decided in the earlier federal action. In particular, the plaintiff's allegations in subparagraphs 6C, 6D, 6F and 6H, and to some degree 6A and 6B, all claim that O & G caused the commission to act improperly. The allegations that the commission, and Turri and Pacheco in particular, acted improperly were fully litigated and decided against the plaintiff in the federal action. All of the plaintiff's allegations against the commission and its members in the federal action were disposed of either by summary judgment or by the jury, which specifically rejected each of the plaintiff's remaining claims in the jury interrogatories. Under *Efthimiou*, the actions of a defendant in a prior action, having been fully litigated in the prior proceeding, cannot be imputed to the current defendant if the relevant issues were decided against the plaintiff in the prior proceeding. Because the plaintiff has not presented evidence that O & G committed a prior wrong giving rise to a continuing duty, nor evidence of subsequent *related* conduct[11] within the statutory period, the plaintiff's continuing course of conduct argument must fail. We conclude that the court properly rendered summary judgment on statute of limitations grounds with respect to the plaintiff's allegations in subparagraphs 6A, 6B, 6C, 6D, 6E, 6F and 6H.

## II

Having concluded that the court properly decided seven of the plaintiff's eight allegations on statute of limitations grounds, we must address the plaintiff's remaining allegation, contained in subparagraph 6G of the amended complaint, that O & G enforced noncompetition requirements among potential competitors in the area. O & G moved for summary judgment on this allegation on the ground that it lacked competent evidence. We agree with O & G because the plaintiff has

---

[11] See footnote 10.

failed to present any evidence to raise a genuine issue of material fact as to this allegation.

The plaintiff bases this allegation on a conversation between the plaintiff and an alleged employee of a competitor in which the employee described a noncompete agreement with O & G. In a deposition, the plaintiff admitted that the employee later denied the existence of any such agreement. Also, the plaintiff admitted that she had never seen the agreement. In response, O & G has submitted an affidavit attesting that it has not entered into any agreement with any competitor that would limit or restrict the competitor's right to sell its products in competition with O & G. The plaintiff has failed to produce any evidence sufficient to raise a genuine issue of material fact regarding the existence of any noncompete agreements. Therefore, in light of O & G's affidavit and the lack of any competent evidence submitted by the plaintiff in opposition, the court properly concluded that there was no genuine issue of material fact with respect to the plaintiff's allegation that O & G was enforcing noncompetition requirements against potential competitors.

The judgment is affirmed.

In this opinion the other judges concurred.